EVELINE P. LOCKE vs. BELMONT CONGREGATIONAL SOCIETY.

SYLVESTER C. FROST vs. SAME.

MERTON SIMONDS vs. SAME.

Middlesex.   November 16, 1892. — January 5, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Religious Society — Pews — Subscriptions — Liability of Corporation.*

In an action against a religious society it appeared that in 1857 all but twenty-eight of the pews were sold or otherwise disposed of. The moneys raised for the support of public worship and other parochial charges and for repairs of the meeting-house were from and after that time assessed upon the pews according to the valuation under the St. of 1845, c. 213, § 1, (Pub. Sts. c. 38, § 38,) and continued to be so assessed year by year until 1883. In 1858, the society being in debt for part of the cost of erecting its meeting-house, a committee which was appointed to obtain subscriptions recommended a vote authorizing it "to take subscriptions for the purpose of paying the debt, with the agreement that said subscribers may at any time receive the amount of their subscriptions in pews, and that all sales of pews shall be divided among such subscribers as do not take pews in proportion to their subscription till the amount is refunded." The report was accepted, and it was voted that the committee be "authorized to solicit subscriptions to cancel the debt of the society on the terms therein proposed." It appeared that at a subsequent meeting the committee reported "that the amount required to pay off the debt of the society was nearly made up, whereupon parties came forward and made up the deficiency." The plaintiffs' testator and intestates were subscribers and members of the corporation, and each had previously owned and occupied one of the pews in the meeting-house. To each subscriber a receipt was given by the treasurer, stating that it was for subscription for the payment of the debt, "the same to be returned him as provided by vote of the society, March 2, 1858." The land and the meeting-house thereon were sold in 1889, and up to that date none of the twenty-eight pews unsold in 1857 had been disposed of. The sums paid by the subscribers were never returned in money or in pews. In March, 1883, the parish committee recommended that "for one year at least, in lieu of pew taxes, a subscription be taken from everybody willing to recognize it to be their duty to help support public worship in our town"; and at an adjourned meeting on April 23, 1883, it was voted to adopt the terms reported by a committee to solicit subscriptions, which terms were in the form of a subscription, the payment to be in lieu of all rent of pews, and "all present engagements of pews are to continue in force, and that any subscriber not at present owning or hiring a pew to have privilege of seats in pews at present unoccupied." Thereafter the expenses, etc. were paid by subscriptions obtained upon the above terms, instead of by assessments levied on the pews. The plaintiffs' testator and intestates continued to be members of the corporation and to hold their pews, and they were regular subscribers to the society's annual expenses under the terms adopted by the vote of April 23, 1883. The actions were brought to recover the sums paid in 1858. *Held,* that these sums were not loans, but gifts, and that the

transaction was not the substitution of one set of creditors for another, but an extinguishment of the debt of the society. *Held, also,* that the society was not liable for having, by the sale of the meeting-house, put it beyond its power to allow the subscribers to take the amount of their subscriptions in pews, or to divide among them the proceeds of the sales of pews.

CONTRACT. The plaintiff in the first case was the executrix of the will of Edwin Locke, and the plaintiffs in the second and third cases were the administrators of the estates respectively of William Henry Locke and John L. Alexander. The cases were submitted to the Superior Court, and, after judgment for the defendant, to this court, on appeal, upon agreed facts, in substance as follows.

The defendant is a religious society, duly organized and incorporated on February 5, 1856, under the Rev. Sts. c. 20, §§ 27, 28. Soon thereafter it built at what is now Belmont, upon land purchased by it for the purpose, a meeting-house, which was dedicated on October 28, 1857, and was thereafter occupied by the society as its regular place of worship until the year 1889, when the land and meeting-house were sold by the defendant, as below stated. The meeting-house contained fifty-nine pews. A valuation of the pews was agreed on and recorded by the clerk in pursuance of the St. of 1845, c. 213, § 1, (Pub. Sts. c. 38, § 38,) and on October 28, 1857, all but twenty-eight of the pews were sold or otherwise disposed of by the society. The moneys raised by the society for the support of public worship and other parochial charges and for the repairs of the house were from and after that time assessed by the society upon the pews, according to the valuation under the provisions of the above statute; and continued to be so assessed year by year during the occupation of the meeting-house by the society until the year 1883, when a different method of raising its annual expenses was adopted by vote of the society, as below stated. It appeared by the records of the society, that in January, 1858, the society being in debt for part of the cost of erecting the meeting-house, a special finance committee of three of its members was chosen at a meeting of the society held on January 6, 1858, to obtain subscriptions to liquidate the debt. It further appeared by the records, that at a subsequent meeting of the society, held on March 2, 1858, the committee made the following report:

" The special finance committee would report, that they have not been able to make up the full amount of subscription to pay the parish debt, but feel encouraged to believe that with a little more time they may do so ; and with this belief they would ask further time, and would recommend a vote authorizing the committee to take subscriptions for the purpose of paying the debt, with the agreement that said subscribers may at any time receive the amount of their subscriptions in pews, and that all sales of pews shall be divided among such subscribers as do not take pews in proportion to their subscription till the amount is refunded."

It further appeared by the records, that the report was read and accepted, and it was voted that the committee be " authorized to solicit subscriptions to cancel the debt of the society on the terms therein proposed."

At a subsequent meeting of the society duly held, March 23, 1858, it appeared by the records that the special finance committee reported " that the amount required to pay off the debt of the society was nearly made up, whereupon parties came forward and made up the deficiency." The names of the subscribers and the amounts subscribed by each are given on the records, it appearing that there were fifteen subscribers, and the total amount subscribed and paid was $2,840 ; that Edwin Locke, William Henry Locke, and John L. Alexander were among the subscribers; and that Edwin Locke subscribed $140, William Henry Locke $300, and John L. Alexander $300. Each of said subscribers was a member of the defendant corporation, and previously owned and occupied one of the pews in its meeting-house. To each subscriber a receipt was given by William Henry Locke, who was then treasurer of said society. The receipt stated that it was for " subscription for the payment of the debt of the Belmont Congregational Society, the same to be returned him as provided by vote of the society, March 2, 1858." Of the twenty-eight pews unsold at the time of the votes and subscriptions referred to, none were ever sold up to the date of the sale of the meeting-house below stated. The sums of $140, $300, and $300 have never been returned to the subscribers in money or in pews.

On March 26, 1883, at a meeting of the society, the parish com-

mittee presented a report recommending that "for one year at least, in lieu of pew taxes, a subscription be taken from everybody willing to recognize it to be their duty to help support public worship in our town." At an adjournment of the meeting, on April 23, 1883, a committee previously chosen to solicit subscriptions reported that the following terms of subscriptions be adopted: "We the undersigned hereby agree to pay during the ensuing year, beginning with April 1st, 1883, the sums set against our respective signatures, it being understood that said payments are to be paid in quarterly instalments, and are to be in lieu of all rent of pews, it being understood further that this is for all contributions for the benefit of the American Unitarian Association or the Middlesex Conference. It being also understood that all present engagements of pews are to continue in force, and that any subscriber not at present owning or hiring a pew to have privilege of seats in pews at present unoccupied for self and for family."

It was voted by the meeting to adopt the terms, and from that time to the sale of the meeting-house the annual expenses of the support of public worship and other parochial charges, with the repairs of the meeting-house, were paid by subscriptions obtained upon the above terms, instead of by assessments levied on the pews. From and after that date the society allowed its unsold pews above mentioned to be occupied by persons subscribing to its expenses on the terms above stated, and abandoned all efforts to sell its unsold pews as such, or any of them. On January 21, 1889, it having previously been voted by the society to build a new meeting-house upon a different site, it was voted at a meeting duly held that the treasurer be authorized to execute, acknowledge, and deliver a deed conveying its real estate and buildings thereon to one Fletcher, upon receipt of the sum of $4,000. The deed referred to was executed and delivered accordingly, January 28, 1889, and said purchase money paid, and it conveyed the said real estate and buildings, being the meeting-house erected by the society as hereinbefore stated, with the lot of land whereon the same stood, "including fixtures and furnishings, except the organ and bell." The above sale was made by the society for the purpose of building its proposed new meeting-house, since built and occupied by the society. Edwin

Locke, William Henry Locke, and John L. Alexander continued to be members of the defendant corporation, and to hold their pews in its meeting-house, down to the time of their respective deaths. They were each of them · regular subscribers to the society's annual expenses under the terms first adopted by the above vote of April 23, 1883 ; Edwin Locke to the time of his death, William Henry Locke and John L. Alexander until July, 1888, after which time they ceased to contribute toward said expenses. The plaintiff in the first case, after Edwin Locke's death, continued to hold his pew and to pay the same amount of contribution toward the annual expenses as paid by him until the sale of the meeting-house.

*J. A. Bennett*, for the plaintiffs.

*F. Dodge*, for the defendant.

BARKER, J.   The plaintiffs erroneously assume that the transactions of their decedents with the defendant in 1858 were loans to the society. The receipts given by its treasurer are to be construed in the light of the circumstances then existing, as shown by the agreed statement of facts, and particularly with the report of the committee charged with the liquidation of the debt of the society, and the vote authorizing them to solicit subscriptions and to cancel the debt on the terms therein proposed. So construed, it is plain that the sums for which the receipts were given were not loans, but gifts. The transaction was not the substitution of one set of creditors for another, but an extinguishment of the debt of the society. The vote that the subscribers might receive the amount of their subscriptions in pews, and that all sales of pews should be divided in proportion to the amount of subscriptions until the amount should be refunded, was not a promise to repay. It imposed no obligation upon the society, except to allow the subscribers to take pews, if they chose, and to apply, as agreed, the proceeds of any sale ; and the terms of the receipt, referring to the vote, imposed no other or different obligation. The society was therefore not a debtor of the decedents, and was under no express or implied promise to pay money until it should become possessed of funds the proceeds of the sales of pews. No pews were thereafter sold, unless the sale of the meeting-house itself in 1889 was a sale of pews within the meaning of the vote. The society was organ-

ized in 1856, and the meeting-house built the next year. The pews were always personal property. St. 1855, c. 122. Those referred to in the vote had never been sold by the society when the vote was passed. Treating them, as against the society, as distinct articles of property, they were at most rights to use portions of the meeting-house for the purpose of attending public worship, and involved no ownership in the soil, the structure, or in any of its materials or furnishings. *Wentworth* v. *First Parish in Canton*, 3 Pick. 344. It is plain that these rights were not sold, but extinguished by the sale of the meeting-house. The defendant has not by that sale received money from the sale of pews.

The question remains whether the society is liable for having, by the sale of the meeting-house, put it beyond its power to allow the subscribers to take the amount of their subscriptions in pews, or to divide among them the proceeds of the sales of pews. The agreed facts show no such liability. In the first place, the fact that the society, with the acquiescence of all the decedents, from 1883 discontinued all assessments upon pews, and thereafter relied for funds wholly upon voluntary subscriptions, allowing any subscribers to use the unsold pews, and abandoning all efforts to sell them, and that it continued this course until the sale of the meeting-house, shows a voluntary abandonment for the benefit of the society, by the subscribers of 1858, of the rights given them by the vote and by their receipts. Again upon the proper construction of the transaction of 1858, all parties must be taken to have acted in view of the possibility, always present with a society maintaining a house for public worship, that circumstances might arise requiring them to sell or to rebuild, and that no one intended that such a course should be interfered with by the arrangement then made, or that the subscribers would thereupon have any right to complain, or to share in the proceeds of a sale of the meeting-house.

*Judgment affirmed.*